UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

Case No. 3:20-cv-00641

Hon. Aleta A. Trauger

THE LAMPO GROUP, LLC
d/b/a RAMSEY SOLUTIONS,
Tennessee Limited Liability
Company,

     *Plaintiff*

vs.

MARRIOTT HOTEL SERVICES
INC., a Delaware Company,

     *Defendant.*

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND SUPPORTING MEMORANDUM OF LAW

### INTRODUCTION

Plaintiff THE LAMPO GROUP, LLC d/b/a RAMSEY SOLUTIONS ("Plaintiff" or "Ramsey Solutions") seeks judgment on the pleadings on its claim for declaratory relief set forth in Count I of the Amended Complaint relating to the meaning of two provisions in the Gaylord Palms Resort & Convention Center Agreement executed in September of 2017 (the "Palms Agreement").[1] Dkt. 10. Count I seeks a declaration from this Court that the express language agreed to by the parties in the Palms Agreement allowed Ramsey Solutions to terminate the agreement, eliminated any further performance obligations and required Defendant MARRIOTT

---

[1] Capitalized terms have the meaning used in the Amended Complaint unless otherwise identified. A copy of the Palms Agreement is attached hereto as Exhibit "A."

HOTEL SERVICES, INC. ("Defendant") to return all amounts previously paid by Ramsey Solutions under the Palms Agreement.[2]  Despite the plain language of the Palms Agreement, Defendant disputes this interpretation, and has countersued Ramsey Solutions claiming that it owes additional amounts under the Palms Agreement.  Given the varied interpretation of the two applicable provisions, Plaintiff filed this action.  For the reasons outlined below, Ramsey Solutions is entitled to judgment as a matter of law on Count I of the Amended Complaint.

## ARGUMENT

### I.     Legal Standard

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." *Willis v. RhinoAg, Inc.*, No. 10-cv-01276-STA, 2020 WL 2529842, at *1 (W.D. Tenn. May 18, 2020) (quoting Fed. R. Civ. P. 12(c).  "The standard of review for a judgment on the pleadings is the same as that for a motion to dismiss under Federal Rule of Procedure 12(b)." *Id.* (citing *EEOC v. J.H. Routh Packing Co.*, 245 F3d 850, 851 (6th Cir. 2001)).

"When a party invokes FRCP 12(c), the Court construes 'all well-pleaded material allegations of the pleadings of the [non-movant] ... as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment.'" *Massachusetts Mut. Life Ins. Co. v. RCS – Germantown I, LLC*, 2020 WL 6999223, at *2 (W.D. Tenn. Jan. 2, 2020) (citing *JPMorgan Chase Bank, N.A. v. Winget*, No. 19-cv-02198-SHL, 510 F.3d 577, 581 (6th Cir. 2007)).  The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" except that allegations that "are no more than conclusions[]

---

[2] The Palms Agreement detailed the "rights and obligations of the parties in connection with an event (*Entre*Summit 2020) (the "Event") that was to take place at the Gaylord Palms Resort and Convention Center (the "Hotel").

are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). As detailed below, Ramsey Solutions is entitled to the declaratory relief sought in Count I based on the plain language of the Palms Agreement and the pleadings in this case.[3]

## II.    Judgment on the Pleadings on Count I Is Appropriate

### A.    The Relevant Provisions of the Palms Agreement are Unambiguous

The Palms Agreement was executed in September of 2017 and outlined the terms of the parties' agreement related to an event that was to occur in 2020, the *Entre*Summit 2020 (the "Event"). As outlined in the Palms Agreement, the Event would have required the Hotel to host more than one thousand guests, each of whom would attend group seminars and functions in the convention center facilities.[4] Ex. A, pp. 1 and 7-11. The Palms Agreement contains express language permitting Ramsey Solutions to cease performance and requiring Defendant to return all

---

[3] To the extent that Defendant were to argue that Florida law applies because the Hotel is located in Central Florida, the result would be the same. Florida law is clear that where no issues of material fact exist, the movant is entitled to judgment as a matter of law. *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014). Thus, even accepting the facts in Defendant's Answer as true, and viewing all the allegations in the light most favorable to the nonmoving party, this motion should nonetheless be granted. *Id.* A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1350 (11th Cir. 2018); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (stating that a motion to dismiss should be granted only when the pleading fails to contain "enough facts to state a claim to relief that is plausible on its face").

[4] As shown by the chart appearing at pages 7 through 11 of the Palms Agreement, each day, Ramsey Solutions was to host seminars and events in the convention facilities at the Hotel that would have catered to hundreds of attendees and staff. Ex. A, pp. 7-11. It was also agreed that the Hotel would be catering buffet food and beverage service throughout the day for the scheduled events. *See, e.g.*, Ex. A, pp. 5 ("Ten Percent (10%) Discount off current year banquet menu pricing"); 8 ("Dessert Reception" and "Reception"); 9 ("Osceola Ballroom" "Lunch" "2000" [referring to the number of attendees]); 10 (same); 11 (same; also "General Session" "2000" [referring to the number of attendees]). This is exclusive of the "Coffee Break" and other food and beverage service to be offered to these guests, which the Hotel agreed that the food and beverage service is a "major component" of the Palms Agreement.

deposit amounts paid. On July 3, 2020, Ramsey Solutions confirmed its termination of the Palms

Agreement due to the pandemic, which prevented the Hotel from hosting the Event consistent with

the terms of the Palms Agreement.[5] Defendant admits that the copy attached to the Amended

Complaint is a true and correct copy of the same.[6] Important here, Defendant has not asserted the

defense of ambiguity or mistake, nor has it cited to any provision in the Palms Agreement that

eliminated the right of Ramsey Solutions to be excused from performance under the circumstances.

For this reason, the issues raised in this motion are ripe for judgment on the pleadings.

The language in the Palms Agreement is unambiguous, and two provisions in particular

support Ramsey Solutions' right to have terminated the agreement and be excused from

performance. One such example is the "For Cause Termination" provision that states, in part:

> ….Notwithstanding any provision to the contrary herein, ***Group [Ramsey Solutions] may at any time terminate this Agreement without penalty*** in the event Hotel, its parent, subsidiary or affiliated businesses, principals or executives become engaged in, accused of or subject to any public scandal, political controversy, crime, fraud ***or other event that in Group's sole judgment will impair or damage its brand or good will by hosting an event at Hotel***. In such event, Group shall provide prompt notice and the ***Hotel shall refund all deposits and/or prepayments made by the Group within thirty (30) days of receipt of the notice of termination.***

*See* Ex. A, p. 13 (emphasis supplied). This provision standing alone afforded Ramsey Solutions

the right to terminate the Palms Agreement if in its "sole judgment" moving forward with the

---

[5] A copy of the termination letter is attached hereto as Exhibit "B." Defendant admitted that Ramsey Solutions sent this termination letter to Mike Stengal on July 3, 2020 and that a true and correct copy of the same is attached to the Amended Complaint. Answer, ¶46.

[6] Answer, ¶¶ 5, 28 (Defendant also admitted that the Palms Agreement was entered into "two and half years before the event was to take place" and "refer[s] to the Palms Agreement for its true meaning and effect."); 32 ("Defendants admit that Marriott and Ramsey Solutions entered into the Palms Agreement and refer to the Palms Agreement for its true meaning and effect, including the contracted terms mentioned by Ramsey Solutions in this paragraph."); 33 (same); 34 (same); 48; 81; and 82.

Event given the restrictions and changes imposed (regardless of fault) would "impair or damage its brand or good will by hosting an event at the Hotel." The provision requires Defendant to "refund all depositions and/or prepayments…within thirty (30) days of receipt of the notice of termination," but it has failed to do so (and, in fact, has countersued claiming additional funds must be paid).

The Palms Agreement also contains a Force Majeure clause that separately allowed Ramsey Solutions to be excused from performance:

> ***Either party may be excused from performance without liability if circumstances beyond its reasonable control, such as acts of God,*** war, acts of domestic terrorism, strikes, ***or similar circumstances***, ***make it illegal or impossible to provide or use the Hotel facilities.*** The ability to terminate pursuant to this clause is conditioned upon delivery [sic] written notice to the other party setting forth the basis for such termination within ten (10) days after learning of such basis.

*Id.* (emphasis supplied). As is clear from the plain language, the Force Majeure provision includes a non-exhaustive list of circumstance excusing performance concluding with the catch-all phrase "or similar circumstances." The provision is open-ended, with the only limiting language requiring that the circumstance be beyond the reasonable control of either party. Thus, unlike some force majeure provisions that are limited to identified perils, the one agreed to by the parties here makes clear that any circumstance that is beyond either party's control is sufficient to excuse performance.

Here, the parties agreed to specific language that outlined their respective rights and obligations. The Palms Agreement—executed in 2017—was predicated on the Hotel being able to hold a first-class event for several thousand people, with all of the attendant high-end amenities including spa, gym, valet and room service as well as buffet food and beverage service throughout

the day during the various events.[7]  Through no fault of the parties,[8] COVID-19 made this impossible.  The parties clearly contemplated that there may be situations that would render performance under the Palms Agreement impossible or that could be otherwise detrimental to the business of Ramsey Solutions.  For this reason, the parties negotiated the above provisions, either of which, standing alone, allowed Ramsey Solutions to terminate the Palms Agreement.

Despite the plain language of the Palms Agreement in these two provisions, Defendant asserts that Ramsey Solutions had no such rights and has refused to refund the deposit of $1.2 million that Ramsey Solutions paid to Defendant. Given Defendant's position regarding the meaning of the Palms Agreement, Ramsey Solutions filed this action seeking, among other things, declaratory relief on the meaning of these two provisions in the Palms Agreement. Taking each of the above clauses together or separately, the Palms Agreement allowed Ramsey Solutions to terminate the agreement and be excused from further performance and required Defendant to return all deposits.

**B.**     **Ramsey Solutions Properly Terminated the Gaylord Palms Agreement Based on the Plain Language Agreed to by the Parties**

The interpretation of a contract is a question of law for the Court to decide.  "When a contract is not ambiguous, its interpretation is a question of law that is appropriate for summary judgment."  *HealthPRO Heritage, LLC v. Health Servs. Manchester, LLC*, No. 19-cv-143, 2019 WL 8137135, at *2 (E.D. Tenn. Dec. 13, 2019) (quoting *Battery Alliance Inc. v. T & L Sales Inc.*,

---

[7] *See, e.g.,* Palms Agreement at pp. 2 (charging $22 plus taxes for, among other things, 24-hour access to Relache Fitness Center, private training sessions, bottled water); 11 (banquet service pricing); 12 (Relache (on-site resort spa)).

[8] A party is not relieved of liability when the triggering event is caused by the party's own conduct or developments that the party could have "prevented or avoided or remedied by appropriate corrective measures." *United Brake Sys., Inc. v. Am. Envtl. Prot., Inc.*, 963 S.W.2d 749, 756–57 (Tenn. Ct. App. 1997).  That is not this case, however.

6

No. W2015-00201-COA-R3-CV, 2015 WL 6873202, at *5 (Tenn. Ct. App. Nov. 9, 2015));

*Bourland, Heflin, Alvarez, Minor & Matthews, PLC v. Heaton*, 393 S.W.3d 671, 674 (Tenn. Ct.

App. 2012) ("Questions of contract interpretation are generally considered to be questions of law,

and thus are especially well-suited for resolution by summary judgment.") (quoting *Ross Prods.*

*Div. Abbott Labs. v. State*, No. M2006-01113-COA-R3-CV, 2007 WL 4322016, at *2 (Tenn. Ct.

App. Dec. 5, 2007)).[9]

In *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, the

Supreme Court of Tennessee examined at length whether courts should interpret a contract based

on the plain meaning of the text alone, or whether they should look to parol evidence. 566 S.W.3d

671 (Tenn. 2019). There, the court held that "Tennessee's jurisprudence on contract interpretation

cannot be neatly categorized as wholly textualist or wholly contextualist." *Id.* at 687.

However, the court found informative the foundational principles of contract interpretation

in Tennessee.

> The common thread in all Tennessee contract cases—the cardinal rule upon which all other rules hinge—is that courts must interpret contracts so as to ascertain and give effect to the intent of the contracting parties consistent with legal principles. Also foundational to our jurisprudence is the principle that the rules used for contract interpretation have for their sole object to do justice between the parties, by enforcing a performance of their agreement according to the sense in which they mutually understood it at the time it was made.

*Id.* at 688 (internal citations omitted). By contrast, regarding parol evidence, "in interpreting a

fully integrated contract, extrinsic evidence may be used to put the written terms of the contract

into context, but it may not be used to vary, contradict, or supplement the contractual terms." *Id.*

---

[9] Florida law is the same. Contract interpretation is a matter of law for the court, and begins with the plain meaning of words used, and words are "to be given natural, ordinary meaning." *See Ferox, LLC v. Conseal Int'l, Inc.*, 175 F. Supp.3d 1363, 1371 (S.D. Fla. 2016). Where an agreement is unambiguous, it should be interpreted applying its plain meaning and give effect to the entire contract. *Wash. Nat'l Ins. Corp. v. Ruderman*, 117 So.3d 943, 948 (Fla. 2013); *see also CBS Inc. v. Prime Time 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001).

at 698. The court noted that "An elementary precept of contract law' is that when the language is clear, courts must not look beyond the four corners of the instrument." *Id.* at 691, n.19 (citations omitted). "A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one. A strained construction may not be placed on the language used to find ambiguity where none exists." *Farmers—Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975).

### i. The Force Majeure Provision Excused Performance

The above provides the lens through which this Court must view the two provisions at issue. As can be seen from a review of the Force Majeure provision in the Palms Agreement, its language "defines the scope of unforeseeable events that might excuse nonperformance by a party." *Bayader Fooder Trading, LLC v. Wright,* No. 13–2856, 2014 WL 5369420, at *3–5 (W.D. Tenn. Oct. 21, 2014); *see also Sun Operating Ltd. P'ship v. Holt*, 984 S.W.2d 277, 282-83 (Tex. App. 1998) ([W]hen the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure.") (citations omitted); *Home Devco/Tivoli Isles LLC v. Silver*, 26 So.3d 718, 722 (Fla. 4th DCA 2010) ("[A]s long as the *force majeure* clause limits exclusions to events beyond the control of the seller, and not within its discretion, the contract 'obligates' the seller to complete construction within the two-year period….") (interpreting Florida law).

The agreement itself provides the guidepost for what the parties contemplated. To the point, here the Force Majeure provision allowed either party to terminate and be excused from performance for any reason "beyond its reasonable control":

> Either party may be excused from performance without liability ***if circumstances beyond its reasonable control, such as acts of God, war, acts of domestic***

*terrorism, strikes, or similar circumstances*, make it illegal[10] or impossible to provide or use the Hotel facilities. The ability to terminate pursuant to this clause is conditioned upon delivery [sic] written notice to the other party setting forth the basis for such termination within ten (10) days after learning of such basis.

*Id.* (emphasis supplied).

On its face, the provision has no limitation as to the type and nature of the circumstances that qualify as "beyond the parties' reasonable control." Rather, the Palms Agreement provides a non-exhaustive list of examples and includes the "catch-all" expansive language to include any event that is beyond the reasonable control of the parties.[11] *See, e.g, D&E Const. Co. v. Robert J. Denley Co.*, 38 S.W.3d 513, 518-19 (Tenn. 2001) (where the force majeure clause does not contain an exhaustive list, the court should look at the agreement as a whole); *see also Spirit Broadband, LLC v. Armes*, No. M2015-00559-COA-R3-CV, 2017 WL 384248, at *6-7 (Tenn. Ct. App. Jan. 27, 2017) (introductory phrase, such as "including, but not limited to," served a "descriptive, not restrictive, function") (citing *Sears, Roebuck & Co. v. Roberts*, No. M2014-02567-COA-R3-CV, 2016 WL 2866141, at *6 (Tenn. Ct. App. May 11, 2016) ("including" does not ordinarily introduce an exhaustive list)).

---

[10] Tennessee law provides additional support for the interpretation of some of the terms in the Palms Agreement. Tennessee Rule of Civil Procedure 8.03 includes "illegality" as a defense. Further, under Tennessee law, courts "will not enforce obligations arising out of a contract or transaction that is illegal." *Ledbetter v. Townsend*, 15 S.W.3d 462, 464 (Tenn. Ct. App. 1999). Given the restrictions in place prohibiting large scale events and the other regulations imposed by the CDC and state and local governments, impossibility supports the termination for this reason as well. The Hotel was prohibited from having an event that would include hundreds of individuals (much less over a thousand) in July of 2020 as was contemplated in the Palms Agreement and would have been required if the Hotel was to fulfill its obligations under the contract. *See* Ex. A, p.1. The "Guest Sleeping Block" chart in the Gaylord Palms Agreement confirms that the parties anticipated that there would be more than a thousand individuals attending the Event, and that hundreds of people would be attending seminars in the convention center facilities. *See* Amended Complaint, ¶¶ 2-3; Ex. A, pp. 1 and 7-11. This was simply impossible given the restrictions in place at the time.

[11] Patrick J. O'Connor, Allocating Risks of Terrorism and Pandemic Pestilence: Force Majeure for an Unfriendly World, Constr. Law., Fall 2003, at 5, 10.

9

Based on the language agreed to by the parties, Ramsey Solutions was well within its right to terminate the Palms Agreement as Defendant could not provide the services or amenities as outlined in the Palms Agreement and could not otherwise fulfill the terms of the contract.[12]  *See, e.g., Sherwin Alumina L.P. v. Aluchem Inc.,* 512 F.Supp.2d 957, 967 (S.D. Tex. 2007) (Texas court confirming that a force majeure clause excused performance where the party could not produce the product at all or within the time specified in the contract); *North Am. Capital Corp v. McCants*, 510 S.W.2d 901, 905 (Tenn. 1974)  ("The essence of the modern defense of impossibility is that the promised performance was at the making of the contract, or thereafter became, impracticable owing to some extreme or unreasonable difficulty, expense, injury, or loss involved, rather than that it is scientifically or actually impossible."); *Rural Devs., LLC v. Tucker*, No. M2008-00172-COA-R3-CV, 2009 WL 112541, at *10 (Tenn. Ct. App. Jan. 14 2009) (frustration of purpose "has been invoked to negate contractual obligations in circumstances where unanticipated events, like newly-enacted regulation or illness of a performance interfere with expectations. Among its requirements is that 'the frustration must have resulted without the fault of the party seeking to be excused.' …  Additionally, both parties must share the basic assumption that is frustrated.") (citations omitted).  Notably, there is no language that required fault in order to invoke the provision, nor has Ramsey Solutions alleged any fault on the part of Defendant.  Rather, due to circumstances beyond either parties' control, the Hotel simply could not host the Event as outlined and agreed upon by the parties.

Defendant is a sophisticated party, negotiating agreements of this sort with a frequency far

---

[12]  *See also Harvey v. Lake Buena Vista Resort, LLC,* 568 F. Supp.2d 1354, 1367 (M.D. Fla. 2008) (Impossibility applies to Florida contracts "where purposes for which the contract was made, have, on one side become impossible to perform."); *Bland v. Freightliner, LLC,* 206 F. Supp. 2d 1202, 1207-8 (M.D. Fla. 2002); *Spring Lake NC, LLC v. Figueroa,* 104 So. 3d 1211, 1216 (Fla. 2d DCA 2012).

10

greater than Plaintiff. If it wanted the terms of the Force Majeure provision to be read to only apply to specific or limited circumstances, the Palms Agreement could have been written that way, *to wit*: the parties could have included an exhaustive list of circumstances that would allow for nonperformance. Defendant did not do so. It is not free to re-write the agreement after the fact. Here, the Force Majeure provision was written broadly to allow both parties the ability to terminate and be excused from performance (and liability) for any circumstance beyond their reasonable control. Defendant cannot claim foul simply because it does not like the result. The time to negotiate for additional rights was before the Palms Agreement was executed.[13]

Even if there was no "catch all" allowance, the interpretation of the phrase "act of God" itself excuses performance. An "Act of God" has been defined by Tennessee courts as "when it happens by the direct, immediate, and exclusive operation of the forces of nature, uncontrolled or uninfluenced by the power of man and without human intervention." *Butts v. City of S. Fulton*, 565 S.W.2d 879, 882 (Tenn. Ct. App. 1977).[14] The "[event] must be of such character that it could not have been prevented or escaped from by any amount of foresight or prudence, or by the aid of any appliances which the situation of the party might reasonably require him to use." *Id.* [15] Thus,

---

[13] It is noteworthy that the Palms Agreement was principally drafted by Defendant, not Ramsey Solutions. Although the parties agree there is not ambiguity, to the extent there was, "[a] n ambiguous provision in a contract generally will be construed against the party drafting it." *Gatlinburg Roadhouse Investors, LLC v. Porter*, 2012 WL 6643809, at *6 (Tenn. Ct. App. Dec. 20, 2012) (citing *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006) (citing *Hanover Ins. Co. v. Haney*, 425 S.W.2d 590, 592 (1968); *Vargo v. Lincoln Brass Works, Inc.*, 115 S.W.3d 487, 492 (Tenn. Ct. App. 2003)).

[14] *See also Home Devco/Tivoli Isles LLC v. Silver*, 26 So.3d 718, 722 (Fla. 4th DCA 2000) (citing *Stein v. Paradigm Mirasol, LLC*, 586 F.3d 849 (11th Cir. 2009)) (Florida law permits the broad enforcement of force majeure provisions so long as doing so does not render the agreement illusory; *Camacho Enterprises, Inc. v. Better Constr., Inc*., 343 So. 2d 1296, 1297 (Fla. 3d DCA 1977); *St. Joe Paper Co. v. State Dep't of Envtl. Regulation*, 371 So 178, 180 (Fla. 1st DCA 1979).

[15] Tennessee has provided guidance in other statutes and regulations as well. By example, in reference to a filing required under the workers compensation law, the Tennessee Code permits

even if the provision were read narrowly, applying the interpretation of Tennessee courts, the pandemic would nonetheless qualify and constitute an excuse from performance. *See also, Am. Book Co. v. Consol. Group of Cos., Inc.*, No. 3:09-CV-112, 2011 WL 11969, *2 (E.D. Tenn. Jan. 4, 2011).[16]

The Force Majeure provision also allowed for non-performance in the event of illegality. The Hotel is located in Central Florida. In response to the COVID-19 pandemic, the State of Florida issued multiple emergency orders restricting movement and gatherings for residents and visitors. On March 24, 2020, Florida Governor Ron DeSantis signed Executive Order No. 20-82,

---

extension "for acts of God, public enemies, fire, flood, storms, or similar events constituting force majeure that cause the group to require more time to meet the filing requirements." Tenn. Code Ann. § 50-6-405(c)(4)(A). Further, references appear in Tennessee regulations. Two Department of Health regulations governing hospitals and health insurance providers afford the opportunity to delay or avoid penalties for failure to comply with certain provisions "if the failure to correct is due to force majeure or other events of extraordinary circumstances clearly beyond the control of the hospital." Tenn. Comp. R. & Regs. 1200-07-03- .04 & 0780-01-79-.06.

Another example is found with respect to procurement contracts, which regulations allow that: "[a]ll contracts subject to these Rules shall contain a provision that relieves the contracting parties of performance in the event of a force majeure, which includes, by way of example, acts of God, war, or civil unrest." Tenn. Comp. R. & Regs. 0690-03-01-.17. As with the situation here, the statute and regulations mirror the broadness of the provision at issue, which is not limited to the situations identified; rather, the provision at issue was crafted broadly to include any circumstance beyond the parties' control.

[16] This interpretation of the plain language is consistent with the standard in commercial agreements generally, which is one of impracticability. Specifically, performance is excused when it is not practical and could be done only at excessive and unreasonable cost. *Transatlantic Fin. Corp. v. United States*, 363 F.2d 312, 315 (D.C. Cir 1966). The Restatement (Second) of Contracts provides that when, "after a contract is made, a party's performance is made impracticable without [the party's] fault by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made, [the party's] duty to render that performance is discharged as a result, unless the language or the circumstances indicate the contrary." Restatement (Second) of Contracts § 261 (1981). Essentially the same standard is found in Uniform Commercial Code Section 2–615 involving the sale of goods. Section 2–615(a) sets forth a three-part test: (1) a "contingency" (event or impediment) occurred, (2) which makes contract performance impracticable, and (3) the nonoccurrence of the contingency was a basic assumption on which the contract was made. U.C.C. §2–615(a) (1977).

requiring all persons entering Florida "from an area with substantial community spread … to isolate or quarantine for a period of 14 days from the time of entry into the State of Florida or the duration of the person's presence in the State of Florida, whichever is shorter." Exec. Order No. 20-82, Fla. (available at https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-82.pdf).[17] On the same day, Governor DeSantis issued Executive Order No. 20-83, ordering the State Surgeon General and State Health Officer to issue a public health advisory "against all social or recreational gatherings of 10 or more people." Exec. Order No. 20-83, Fla. (available at https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-83.pdf). On April 1, 2020, Governor DeSantis issued Executive Order 20-91, which found that a gathering in a public place is not an essential activity and required that "[l]ocal jurisdictions shall ensure that groups of people greater than ten are not permitted to congregate in any public space." Exec. Order No. 20-91 (available at https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-9.pdf ). And for those activities that were deemed "essential activities," social distancing was still required.

On June 4, 2020, Governor DeSantis issued Executive Order No. 20-139 (http://www.flgov.com/wp-content/uploads/orders/2020/EO_20-139.pdf), which impacted the entire state except Miami-Dade, Broward and Palm Beach counties. Among other things, the Executive Order required individuals to avoid group meetings of more than 50 people and to maintain appropriate social distancing. It also limited indoor capacity of restaurants and other entertainment businesses to 50% building capacity. It then extended Executive Orders 20-80 and 20-82, which imposed a 14-day self-quarantine on anyone traveling from the New York Tri-State area. On July 7, 2020, Governor DeSantis issued Executive Order No. 20-52-COVID-19

---

[17] Pursuant to Fed. R. Evid. 201, the Court may take judicial notice of "public records and government documents available from reliable sources on the Internet." *Thomas v. Haslam*, 303 F.Supp.3d 585, 625 (M.D. Tenn. 2018) (quoting *U.S. ex rel. Dingle v. BioPort Corp.*, 270 F.Supp2d 968, 972 (W.D. Mich. 2003)).

(available at https://www.flgov.com/uploads/orders/2020/EO_20-166.pdf), which extended Executive Order 20-52 for sixty days. Executive Order No. 20-52 (available at https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-52.pdf). Additionally, Florida encouraged all persons to avoid congregating in groups larger than 10 (available at https://www.floridahealthcovid19.gov/frequently-asked-questions and

https://floridahealthcovid19.gov/travelers).

There were also other local regulations and ordinances enacted[18] as well as those issued by the CDC that made it impossible for the Hotel to host the Event to take place as contemplated in the Palms Agreement. Due to each of these restrictions imposed by various agencies and regulatory bodies, the plain language of the Force Majeure provision excused performance, but, as outlined in Count I, Defendant disagreed and refused to return Ramsey Solutions' deposit and demanded further amounts. The Palms Agreement's language is clear and unambiguous and should be given its plain and ordinary meaning. In doing so, Ramsey Solutions is entitled to a judgment as a matter of law on Count I and a declaration in its favor on the meaning of this provision.

        **ii.**    **The 'For Cause Termination" Provision also Allowed for Termination**

The "For Cause Termination" provision created a separate basis to terminate the Palms Agreement in Ramsey Solutions' "sole discretion" if holding the Event would "impair or damage its brand or good will." *See Overzet v. Bata Corp.*, 1990 WL 62842, at *2-3 (Tenn. Ct. App. May

---

[18] *See, e.g.,* Emergency Order No. 5 Pertaining to COVID-19  effective April 13, 2020 (https://www.osceola.org/core/fileparse.php/7578/urlt/Executive-Order-5-face-covering.pdf) (requiring face coverings consistent with CDC Guidelines); Emergency Ordinance 2020-60 (http://www.osceola.org/core/fileparse.php/7578/urlt/072320-Osceola-County-Ordinance2020-60.pdf)

16, 1990) (finding provision in employment agreement allowing management fee to be increased at employer's sole discretion to be clear and unambiguous, noting that "absent other considerations, such as unconscionability, it will be enforced as written."); *see also Skeen v. First Union Nat. Bank of Tenn.*, No. O3A01-9810-CV-00355, 1999 WL 233539, at *3 (Tenn. Ct. App. Apr. 16 1999) (no breach of contract or breach of fiduciary duty where deposit agreement reserved for defendant bank the "right to amend, in the Bank's sole discretion, the Deposit Agreement's terms and provisions."); *Cagle v. Hybner*, No. M2006-02073-COA-R3-CV, 2008 WL 2649643, at *19 (Tenn. Ct. App. July 3, 2008) ("[T]he court cannot effectively enforce the agreement due to the fact an essential term, whether the songs are of marketable commercial quality, is subject to [Defendant's] 'sole discretion.'").

Defendant agreed that it was within Ramsey Solutions' sole discretion to determine whether hosting the Event would impair its goodwill or otherwise tarnish its brand. Defendant did precisely that when, despite its efforts, the Hotel unilaterally made material changes to the amenities that would be available and that would substantially alter the attendee experience. The Hotel cannot re-write the Palms Agreement after-the-fact to change the phrase "sole discretion" to something less.

As outlined in the Amended Complaint, the restrictions and material changes the Hotel imposed were contrary to those agreed to in the Palms Agreement—*i.e.*, the hotel advised that due to the pandemic, there would be no valet service, no room service, limited gym facilities, the spa would be closed, there would be limitations on the number of individuals who could attend scheduled seminars and receptions, and there would be no buffet food or beverage service, among other restrictions.[19] The restrictions and limitations imposed by the Hotel materially altered the

---

[19] *See* Amended Complaint, ¶¶ 37, 41-43.

intent and purpose of the Palms Agreement and made it impossible to proceed as the changes would materially limit the experience of the attendees, who pay thousands of dollars to attend the Event. Thus, as it was entitled to do given the significant changes being imposed, Ramsey Solutions determined that its brand and goodwill would be prejudicially impacted. The restrictions imposed—regardless of any fault—would alter the guest enjoyment of the Event and materially adversely impact the attendees' perception of the Event (which is an annual event) for years to come. As outlined in the Amended Complaint, guests expect a high-end experience and all of the amenities of a luxury resort, and those amenities are outlined in the Palms Agreement. Ramsey Solutions simply could not risk proceeding with a scaled down Event that did not meet the high expectations of its attendees, nor was it required to as the Palms Agreement expressly gave the right to Ramsey Solutions to terminate the Palms Agreement in its sole discretion.

## **CONCLUSION**

Based on the foregoing, Plaintiff seeks judgment as a matter of law on Count I of the Amended Complaint and such further relief as this Court deems appropriate. In particular, Ramsey Solutions seeks a declaration that it was lawfully entitled to terminate the Palms Agreement, that it was excused from performance, that it does not owe Defendant any additional amounts given the plain language and that Ramsey Solutions is entitled to a refund all deposits paid by Ramsey Solutions under the Palms Agreement.

16

Respectfully Submitted,

By: */s/ Jennifer Altman*
Jennifer Altman
FL Bar No. 881384
Markenzy Lapointe
FL Bar No. 172601
PILLSBURY WINTHROP SHAW
PITTMAN LLP
600 Brickell Avenue, Suite 3100
Miami, Florida 33131
Telephone: 786-913-4880
jennifer.altman@pillsburylaw.com
markenzy.lapointe@pillsburylaw.com

Ashley E. Cowgill (TN Bar No. 033042)

PILLSBURY WINTHROP SHAW
PITTMAN LLP
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
Telephone: 916-329-4721
ashley.cowgill@pillsburylaw.com

*Attorneys LC d/b/a Ramsey Solutions*

## **CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that on, this 25th day of January, 2021, we electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send transmissions of Notices of Electronic Filing on all Counsel of Record.

Respectfully Submitted,

By: */s/ Jennifer Altman*
Jennifer Altman

17